# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DOUGLASS BRIDGEFORD, | * |
| Plaintiff, | * |
| v. | *  Civil Action No. PJM-20-1261 |
| WARDEN LAURA ARMSTEAD, et al., | * |
| Defendants. | * |
| | *** |

## MEMORANDUM OPINION

Plaintiff Douglass Bridgeford is incarcerated at Patuxent Institution ("Patuxent") in Jessup, Maryland, where he contends that he is at risk of dying from the COVID-19 virus. Specifically, Bridgeford asserts that on April 20, 2020, he was rushed to a hospital because he could not breathe normally; he claims that he was "attacked by Covid-19..." ECF No. 1 at 2. Bridgeford states that he was "left to die solitary slow death." *Id.* On May 8, 2020, Bridgeford asserts that he has many chronic medical conditions, and was placed back into the general population with sick inmates who could infect him and others with the virus. *Id.* at 6. Bridgeford claims Defendant Wolf was responsible for moving inmates and reassigning them to different cells, and asserts that Defendants Reed, Lardus, and Armstead knew about the housing reassignments. *See id.* at 3. Bridgeford states that these moves were made recklessly without regard for inmate health. *Id.*

Before initiating formal proceedings, this Court directed counsel for the Division of Corrections to provide an initial response outlining the measures being taken at Patuxent to address Bridgeford's health and safety concerns regarding his cell placement. Declarations signed by Clifford S. Mitchell, M.S., M.D., M.P.H.; Sharon Baucom, M.D.; Warden Laura

Armstead; and Holly Turner indicate that extensive regulatory guidelines have been implemented for the purpose of preventing an outbreak of the COVID-19 virus within correctional facilities, including Patuxent.

## Patuxent Response to COVID-19

On March 5, 2020, the Governor of Maryland, declared a state of emergency in response to the outbreak of the COVID-19 virus. ECF No. 11-3 at 1-2. Since then, counsel for the Division of Corrections asserts that staff at Patuxent has reasonably responded to the COVID-19 pandemic, noting that in *Antietam Battlefield KOA, et al, v Lawrence J. Hogan, et al.*, Civil No. CCB-20-1130, 461 F.Supp.3d 214, 223 (D. Md. 2020), the Honorable Catherine C. Blake determined that Governor Hogan has employed "the emergency powers granted to him by the state legislature, has issued a series of executive orders designed to slow the spread of the disease and to protect the health of Maryland residents" informed by the advice of acknowledged public health professionals." ECF No. 11 at 3-4. Among these public officials is Dr. Clifford S. Mitchell who has been "actively involved in planning and implementing strategies for state agencies," to the address the virus, including working with the Department of Public Safety and Correctional Services ("DPSCS"), on "testing strategies, safe practices, containment and mitigation strategies in congregate housing settings, and safe re-opening strategies and plans." ECF No. 11 at 4; Mitchell Decl., ECF No. 11-2 ¶ 4.

To address the risks posed by COVID-19, Patuxent staff have implemented numerous and comprehensive health and safety precautions.

On March 12, 2020, all regular inmate visitation was suspended, and on March 16, 2020, the DPSCS suspended all direct intakes of prisoners. Armstead Decl., ECF No. 11-5 at ¶¶ 6, 9. Inmates scheduled to be transferred to Patuxent are screened for COVID-19 and are quarantined

for fourteen days prior to and following arrival at Patuxent. *Id.* at ¶ 6. Between May 30, 2020, and July 20, 2020, Patuxent housed overflow COVID-19 positive inmates from other correctional institutions in designated isolation units separated from the Patuxent general population. *Id.*

On April 3, 2020, Patuxent IB 2020-12 was issued implementing the following precautions:

> Enhanced front entry staff screening; Suspension of all outside visitation; enforcement of social distancing when possible (six feet of separation); Increased inventory and usage of PPE; Increased sanitation and disinfecting efforts; Establishment of quarantine and medical isolation areas within the institution; Enhanced transportation procedures; Suspension of all 'pat down' searches absent probable cause...; Suspension of staff overtime at institutions other than their assigned institution; Suspension of all incoming and outgoing inmate transfers; Implementation of 'Grab and Go Meals' to inmates to decrease transfer of germs; Modified inmate movement to reduce the spread of germs; Suspension of all contact sports to comply with social distancing.

*Id.* at ¶ 8. Shortly thereafter, on April 13, 2020, Patuxent was placed on lockdown, requiring the facility to use a minimum number of dietary workers, use a minimum number of Hazmat sanitation workers to clean and disinfect common areas, wear a mask at all times, limit inmate cell activity for phone and shower use to one cell at a time, use inmate maintenance worker for emergencies only, and provide escorts for medical and psychological visits for emergencies only.[1] *Id.* at ¶¶ 10, 20.

On April 13, 2020, all inmates were issued sneeze guards made of washable cloth to cover the nose and mouth; all inmates were mandated to wear them. *Id.* at ¶ 11. Replacements were made available upon request and signage was posted throughout Patuxent advising that personal protective equipment ("PPE") was mandated for both staff and inmates. *Id.* Inmates

---

[1] Time for phone and shower use was later increased from twenty to thirty minutes and cell activity was increased to two cells at a time with no more than four inmates while social distancing. *Id.* at ¶ 10.

were also directed to sleep with their heads in the opposite direction of their cellmates. *Id.* at ¶ 14.

As of March 19, 2020, Patuxent suspended all chapel activities including religious services and programs, requiring inmates to participate in religious worship in their own cells. *Id.* at ¶ 13. On March 26, 2020, alternate dayroom schedules were implemented for odd and even sides of each tier. *Id.* at ¶ 15. Later, on April 11, 2020, inmate movement was limited for each tier to ten inmates at a time in the indoor recreation areas and outdoor recreation was discontinued. *Id.* at ¶¶ 15-16. Outdoor recreation was reinstated on a modified schedule on May 15, 2020. *Id.* at ¶ 16. The dispensary and commissary had a ten-inmate limit with enforced social distancing. *Id.* at ¶ 18.

Defendant Armstead attests that sanitation supplies are available upon request in the housing units. *Id.* at ¶ 22. Moreover, the housing unit tiers are cleaned on an ongoing basis, including the dayrooms after each use and the showers twice daily, with one "intense cleaning weekly." *Id.* The housing unit air handling system filters were cleaned on May 8, July 27, and July 28, 2020. *Id.* at ¶ 23. Fans are available for purchase through the commissary and are being provided free of cost to indigent inmates. *Id.*

Inmates who present with flu-like symptoms must be evaluated by the medical unit as soon as possible. *Id.* at ¶ 26. If an inmate is suspected to have COVID-19, the inmate is taken to a hospital or are placed in isolation. *Id.* at ¶ 27. Isolation and quarantine units are contained within designated housing units on specialized tiers at Patuxent. *Id.* Inmates who have come into close contact with someone who has been diagnosed with COVID-19 are evaluated by medical staff and are quarantined as recommended. *Id.* Both the isolation and quarantine units are monitored by medical staff who determine when inmates may be released back into their

4

regular housing unit. *Id.* When inmates are placed in isolation or quarantine their clothing, sheets, towels, and other launderable items are bagged, labeled infectious, and washed as soon as possible by laundry workers. *Id.* at ¶ 28. Other personal belongings are wiped down with bleach and the cell being vacated is also cleaned with a bleach solution. *Id.* Officers working at offsite hospitals are required to wear PPE. *Id.* Inmates may only be released from quarantine or isolation by order of medical staff. *Id.* at ¶ 29. Unless ordered, there are no restrictions on housing and inmates are assigned based on bed space availability. *Id.*

Contact tracing at Patuxent is used to identify staff and inmates who have come in close contact with an individual who has tested positive COVID-19. *Id.* The contact tracing period is for seven days prior to the positive test result. *Id.* Close contact is defined as very close contact "(less than 6 feet/face to face) for more than 2 minutes or a prolonged period of time in a closed setting without wearing the ordered PPE." *Id.*

## Exhaustion of Remedies

Review of Patuxent's Administrative Remedy Procedure Index for administrative remedies procedure (ARP) complaints shows Bridgeford has not filed any ARPs related to COVID-19 at Patuxent. Holly Turner Decl., ECF No. 11-9. Bridgeford will be granted twenty-eight days to show cause why this action should not be dismissed for lack of exhaustion of administrative remedies.

## Pending Motions

The Court is also in receipt of Bridgeford's (1) Motion to Apply USCA 18 § 3006 to have Counsel, Applied to Pending Case Against the Above Name [sic] Defendants ("Motion to Appoint Counsel"), filed November 16, 2020; (2) Motion to Compel Transfer Til [sic] Ruling ("Motion for Transfer"), filed November 18, 2020; (3) Motion to Compel Truthful Information

under U.S.C.A. 42 § 1983 Civil Rights of prisoners ("Motion to Compel"), filed November 23, 2020; and (4) Motion to Submit Information under USCA 42 § 1983 Violation of Prisoner's Civil Rights in Conjunction to Covid-19 exposure ("Motion for Injunction"), filed March 12, 2020. ECF Nos. 14, 15, 16, 17, 18.

I. Motion to Appoint Counsel

Bridgeford seeks to have the Court appoint counsel in this case. ECF No. 14. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1),[2] is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779 (4th Cir. 1975); *see also, Branch v. Cole*, 686 F.2d 264 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." *See Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by *Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel).

Upon careful consideration of the motions and previous filings by Bridgeford, the Court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. The issues pending before the Court are not unduly complicated. Therefore, there are no exceptional circumstances that would warrant the appointment of an attorney to represent Bridgeford under § 1915(e)(1).

---

[2] Under § 1915(e)(1), a Court of the United States may request an attorney to represent any person unable to afford counsel.

II. Injunctive Relief

Bridgeford's remaining motions request injunctive relief from the Court. ECF Nos. 15-18. Bridgeford's Motion for Transfer and Motion to Compel both specifically request that this Court issue an Order to transfer him from Patuxent to another institution. ECF No. 15 at 2; ECF No. 16 at 2. Bridgeford complains that on October 29, 2020, he was retaliated against by Defendant Reed and has been in segregation since that date. ECF No. 15 at 1; ECF No. 18. He maintains that Patuxent has substandard conditions and asserts that he has been placed in segregation based on a verbal threat alleged by Defendant Reed, who Bridgeford claims has abused her power. ECF No. 16 at 2; *see* ECF No. 15 at 1-2. Bridgeford maintains that he was denied due process, and this has derailed his ability to move to a lower security level. ECF No. 15 at 2. Moreover, he generally states that Warden Armstead's declaration is false, and several cleaning and PPE protocols are not being followed. ECF No. 18 at 2; ECF No. 17 at 2.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), *see also SAS Institute, Inc. v. World Programming Lmtd*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-prong test is "a high bar, as it should be."). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). Bridgeford, as the moving party, must satisfy each of the four requirements. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013). As to irreparable harm, the movant must show the harm to be "neither

remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

Notably, none of Bridgeford's Motions addresses the requirements he must satisfy for preliminary injunctive relief. Regardless, the Court will address each of them in turn. The Eighth Amendment to the Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). An official is liable under the Eighth Amendment if he acts with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). To satisfy the deliberate indifference standard, a plaintiff must demonstrate first, that the alleged deprivation is, objectively, sufficiently serious, and second, that subjectively, the prison official acted with a sufficiently culpable state of mind. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

An official violates the Eighth Amendment rights by exposing an inmate to conditions that pose "a substantial risk of serious harm" to their health. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (internal quotation marks and ellipses omitted).

The Eighth Amendment "protects against future harm," including a "condition of confinement that is sure or very likely to cause serious illness and needless suffering the next

8

week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Constitutional violations could arise from "the exposure of inmates to a serious, communicable disease" even if "the complaining inmate shows no serious current symptoms" and "even though the possible infection might not affect all those exposed." *Id.* "This includes confinement conditions that are 'very likely to cause serious illness and needless suffering' by 'exposure of inmates to [the] serious, communicable disease' of COVID-19." *Seth v. McDonough*, Civil Action No. PX-20-1028; 2020 WL2571168 *10 (D. Md. May 21, 2020) (examining conditions in the context of pre-trial detainees).

COVID-19 is a highly contagious disease that is potentially fatal, especially for individuals in high risk categories. Executive Order 20-04-15-01, ECF No. 11-3 at 14-17; Mitchell Decl. ECF No. 11-2. ¶¶ 5–10. There is no dispute that Defendants were and are aware of the risk that COVID-19 poses; the issue is whether COVID-19 poses a substantial risk that is being disregarded by Defendants.

The subjective component of an Eighth Amendment claim requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 307 (4th Cir. 2004). An official who knows of a substantial risk to inmate health of safety may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014).

In light of the comprehensive measures implemented to prevent introduction and spread of infection from the COVID-19 virus at Patuxent, Bridgeford fails to meet his burden to show that Defendants have failed to act reasonably, or that that Defendants engaged in conduct designed to harm him or create an unacceptable risk to his health. Based on the record, the Court cannot conclude that Defendants disregarded a substantial risk of serious injury to Bridgeford based on the existing and ongoing response to the COVID-19 virus at Patuxent.

The record indicates that Patuxent staff have implemented extensive precautions to mitigate the threat of the disease. Mitigation is all that can be demanded since no science exists to cure or effectively treat COVID-19. *See* Mitchell Decl. ECF No. 11-2 ¶ 10.[3] Scientists all over the world are working to eliminate the risk of the disease, but have yet to effectively do so and this Court can expect no more of Defendants based on this record. This alters the balance of the analysis and lessens the weight that Bridgford's risk of irreparable harm, the second requisite, would otherwise carry. Moreover, when Bridgeford presented with a 100-degree temperature and shortness of breath on April 20, 2020, he was diagnosed positive for the COVID-19 virus and transferred immediately to Baltimore Washington Medical Center. ECF No. 11 at 18; ECF 11-8 at 58. He was placed in isolation and monitored until May 6, 2020. ECF No. 11 at 18; ECF 11-8 at 18. Warden Armstead attests that prior to April 20, 2020, Bridgeford refused his sneeze guard on April 13, 2020, and threw it out of his cell onto the tier. ECF No. 11-7 at ¶ 5, pg. 5-6.

---

[3] Bridgeford filed this action on May 20, 2020. ECF No. 1. As of May 7, 2020, Dr. Mitchell states:

> There is currently no vaccine, cure, or proven effective treatment for COVID-19. The only proven way to address the risk of infection is to avoid it by taking measures designed to reduce the chances of contracting the virus in the first place. And because there is no way to tell whether a person has the virus other than through testing—which is in short supply and, in any event, typically takes one to three days for a result—the Department is recommending preventive measures as part of one's everyday routine: (a) social distancing; (b) facial coverings when in public; (c) hand hygiene; (d) cough and sneeze hygiene; and (e) frequent cleaning and disinfection of "high-touch" surfaces.

ECF No. 11-2 at ¶ 10.

Regarding the balance of equities, the State of Maryland maintains a strong interest in promulgating policies for prison management and security. *See O'Dell v. Netherland*, 112 F.3d 773, 776 (1997); *Taylor v. Freeman*, 34 F.3d 266, 268 (4th Cir. 1994) ("[A]bsent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities."). The State has an interest in ensuring that convicted inmates serve their sentences. Moreover, it is well established that prisoners do not have a constitutional right to demand to be housed in one prison versus another, absent a showing of significant hardship. *See Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution."); *see also Sandin v. Conner*, 515 U.S. 472, 493 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest.). Additionally, inmates who meet certain criteria are in the process of being vetted for release due to the threat of the virus, pursuant to the Maryland Governor's Executive Order Number 20-04-18-01. Armstead Decl., ECF No. 11-3 at ¶ 3, pg. 40-44. Of course, an outbreak of the virus or demonstrated insufficiency of the response at Patuxent could alter this calculus. At this time, the State's interest outweighs any interest Bridgeford has in choosing the facility where he is incarcerated.

The last requirement is whether a preliminary injunction would favor the public interest. Public health is a matter of public concern and limiting the spread of COVID-19 is a matter of public interest. Patuxent's response satisfies the public interest by limiting the spread of the disease. Bridgeford alleges no facts to show his transfer would serve the public interest.

Having concluded that Bridgeford has not met his burden to satisfy all four elements for award of preliminary injunctive relief, Bridgeford's requests for injunctive relief will be denied. Bridgeford will be granted twenty-eight days to show cause why his claims should not be dismissed for to exhaust administrative remedies. Failure to comply with these instructions will result in dismissal of his claims.

## Conclusion

For the reasons set forth above, Bridgeford is granted twenty-eight days to show cause why this action should not be dismissed for lack of exhaustion of administrative remedies. Bridgeford's Motion to Appoint Counsel is denied without prejudice. Bridgeford's Motion for Transfer, Motion to Compel, and Motion for Injunction are denied.

4/13/21
Date

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE